COMINGS, *Appellant*, v. LEEDY *et al.*

Division Two, February 28, 1893.

1. **Mortgage:** MARRIED WOMAN: NOTE.  A mortgage executed by a married woman, her husband joining her, although on land not her separate estate, is valid and binding, notwithstanding the note secured by the mortgage, is void because of her coverture.

2. **Ejectment:** ANSWER: FRAUD.  A separate answer of the wife in an ejectment against herself and her husband states a good defense which alleges that the note and deed of trust under which plaintiff claimed title were without consideration and void, and were obtained by fraud and deceit.

3. **Married Woman's Deed:** IMPEACHING CERTIFICATE OF ACKNOWLEDGMENT: EVIDENCE.  A certificate of acknowledgment of a married woman to a deed is only *prima facie* evidence of the facts recited in it, and the officer who took the acknowledgment is a competent witness either to support or impeach it.

4. ———: ———: ———.  The evidence to overcome the certificate must be clear and convincing.

5. ———: MORTGAGE: STATUTE.  A married woman cannot convey or mortgage her land except in the manner prescribed by the statute authorizing her to do so.

6. **Married Woman:** DEED OF TRUST: SALE: FRAUD.  Where a married woman, by reason of fraud and imposition practiced upon her by the payee's agent, unknowingly executes a note and deed of trust, a sale thereunder by such agent is void and will pass no title.

7. ———: NOTE: INDORSEE.  Where a married woman executed a note for a worthless patent right which she was induced to buy through misrepresentations and fraud, and the note is invalid because of her inability to contract by reason of her coverture, it is void in the hands of an indorsee without notice of the fraud or want of consideration.

8. ———: ———: ———.  A new note given without consideration in renewal of the foregoing one is subject to the same defenses.

9. **Sale:** WARRANTY. The adaptation of a machine to the uses for which it is made is always warranted.

10. ———: FAILURE OF CONSIDERATION. So, where an article is entirely worthless when purchased, there is a total failure of consideration.

*Appeal from Greene Circuit Court.*—HON. W. D. HUBBARD, Judge.

AFFIRMED.

*White & McCammon* for appellant.

(1) The court erred in overruling the motion to strike out part of the separate answers. (2) The misrepresentations complained of, made by Onstott and Smallstig, were simply puffing their wares, promissory in their character, and not representations of any existing state of facts. Evidence of fraud must be clear and convincing. *Dunn v. White*, 63 Mo. 186; *Jackson v. Wood*, 88 Mo. 76; *Keiser v. Gammon*, 95 Mo. 219. (3) The evidence required to impeach the certificate of the notary, even if she had denied its truth, must be something more than testimony of Mrs. Leedy. *Biggers v. St. Louis Mutual*, 9 Mo. App. 210; *Morrison v. McKee*, 11 Mo. App. 594; *Ray v. Crouch*, 10 Mo. App. 321; *Riecke v. Westenhoff*, 10 Mo. App. 358. (4) The deed of trust in question, however, was executed according to statute relating to conveyances by married women. It is regular in form and imports a consideration. And the consideration cannot be inquired into for the purpose of avoiding the instrument. *Henderson v. Henderson*, 13 Mo. 151; *Draper v. Shoot*, 25 Mo. 197; *McConnell v. Brayner*, 63 Mo. 461; *Hollocher v. Hollocher*, 62 Mo. 267; *Bobb v. Bobb*, 89 Mo. 419. (5) The void deed of a married woman may be ratified by a subsequent agreement if the ratification be in the form prescribed by law. *Price v. Hart*,

29 Mo. 171. (6) The evidence shows that there was a good consideration for both deeds of trust. The patent right was sold to Mr. Leedy. The wife gave deed of trust on her land to secure that debt. The second deed of trust was given for the same consideration. In the absence of fraud, it was a valuable consideration, passing to Leedy.

*James W. Silsby*, *C. O. Buckley*, *F. P. Morgan* and *R. G. Campbell* for respondents.

(1) The issues set up by defendant, Mary A. Leedy, in her amended answer clearly set forth equitable defenses which the circuit court fully heard and determined in favor of defendants as it should have done under the equitable defenses. *Estes v. Fry*, 94 Mo. 266; *Durfee v. Moran*, 57 Mo. 374; *Allen v. Logan*, 96 Mo. 591; *Fontane v. Savings Inst.*, 57 Mo. 553. (2) Comings, Smallstig and Onstott were privies and in its findings the court committed no error, and found the allegations of fraud fully sustained as appears by decree. *Keiser v. Gammon*, 95 Mo. 217; *Altringer v. Capeheart*, 68 Mo. 441. (3) The certificate of acknowledgment of a married woman to a deed conveying her land is only *prima facie*, and when she gives evidence under oath the *prima facie* case is rebutted. *Mays v. Price*, 95 Mo. 603. (4) There being no bill of exceptions in this case, and there appearing no error upon the record proper, the judgment of the lower court should be affirmed as this court has none of the facts before it upon which the judge sitting as a jury based his decision, and so defendants pray.

BURGESS, J.—This is an action of ejectment for the possession of lot 56, in Inwood Park addition to the city of North Springfield, Missouri. The petition is in the usual form. The defendants filed separate

answers, alleging that the note and deed of trust under which plaintiff claims title were obtained by fraud and deceit, were without consideration, and also allege that the defendant Mary was the owner in fee of the lot at the time of the execution of the mortgage under which plaintiff claims title, that the mortgage was void, and that the note was obtained in furtherance of a fraudulent design to defraud and cheat defendants.

Plaintiff moved to strike out the separate answer of defendant Mary, which was overruled.

On the seventeenth day of March, 1886, one William A. Smallstig and John H. Onstott, claiming to be the owners of a patent right to certain improvements to what they called a "sad iron," by false and fraudulent misrepresentations upon which defendants relied as to its usefulness, salableness and practicability, sold to the defendant, A. G. Leedy, the territory of Colorado, at which time the defendant Mary executed to them in part payment of the purchase money her individual note for the sum of $1,000, payable in six months after its date, and secured the same by deed of trust on the lot in question, her husband, A. G. Leedy, joining with her in the deed of trust.

Afterwards, and before the note became due, the payees in the note transferred the same to the plaintiff Comings and indorsed on the back thereof, "Without recourse." Subsequently plaintiff through his agent, James B. Milner, solicited defendants to pay an increased rate of interest on the note, which they agreed to do, and gave the last note and deed of trust in lieu of the first, secured by their joint deed of trust on the same property, which they did under the belief at the time that they were simply contracting to pay an increased rate of interest, as was stated by Milner at the time.

Milner was made trustee in the last deed of trust and was acting throughout as the agent of plaintiff. On the eleventh day of February, 1888, after the last note became due, Milner sold the lot as trustee, and it was bought by plaintiff.

On the trial plaintiff read in evidence the deed of trust executed by defendants to Milner as trustee and also his deed as trustee to plaintiff; proved the value of the rents and rested.

Defendants then introduced evidence as follows:

*First.* Defendants to sustain the issue on their part introduced in evidence a general warranty deed from Arthur Ball and Allen A. Ball, conveying the land in controversy to Mary A. Leedy, deed dated the ninth of September, 1884. To the introduction of which deed the plaintiff objected, because the plaintiff had subsequently acquired all the title to the premises, and the deed offered in evidence by defendants is therefore immaterial. The objection was overruled and the plaintiff excepted.

*Second.* The defendant next offered in evidence a deed of trust dated the seventeenth day of March, 1886, executed by Mary A. Leedy and A. G. Leedy, her husband, conveying the premises in controversy to H. D. Silsby, trustee for W. C. Smallstig and John H. Onstott, *cestui que trust;* this deed of trust recites that it is given to secure a promissory note for $1,000 due six months after date to said Smallstig and Onstott, and signed by Mary A. Leedy. To the introduction of which deed of trust the plaintiff objected because irrelevant to the issue in this case. The objection was overruled and the plaintiff excepted.

*Third.* Defendants next offered in evidence a promissory note secured by the deed of trust last above mentioned, together with the indorsement thereon, as follows, to wit.:

"$1,000.     "SPRINGFIELD, Mo., March 17, 1886.

"Six months after date I promise to pay to the order of William C. Smallstig and John H. Onstott, $1,000, without defalcation, value received.

"[Signed]                              MARY A. LEEDY.

"Indorsement:   Without recourse.

                              "JOHN H. ONSTOTT,
                        "WILLIAM C. SMALLSTIG."

New note given in lieu of this to A. C. Comings, May 14, 1887.   To the introduction of which note and indorsement plaintiff objected; objection was overruled by the court and the plaintiff excepted.

*Fourth.* The defendant introduced Mary A. Leedy who testified as follows:

"I am one of the defendants herein.   I have been married to Mr. A. G. Leedy forty-two or forty-three years.   I claim to own lot 56, Inwood Park addition. I have owned it five or six years.   I bought it in the fall of 1884, I think."

Witness then identified the patent right deed.

*Fifth.* The defendants then offered in evidence patent right identified by Mary A. Leedy, as follows:

"Whereas, William C. Smallstig, of Springfield Missouri, did obtain letters patent of the United States for certain improvements in sad iron, which letters patent bear date September 29, 1885, and are numbered 327, 331;

"And, whereas, Archibald G. Leedy of the City of Springfield, county of Greene, state of Missouri, is desirous of acquiring territory thereunder;

"Now, this indenture witnesseth, that for and in consideration of $5,500 to me in hand paid, the receipt whereof is hereby acknowledged, I do grant unto the said Archibald G. Leedy the exclusive right to the whole state of Colorado, and in no other place or

places, the invention secured to William C. Smallstig by letters patent.

"The same to be held and enjoyed by the said Archibald G. Leedy for his own use and behoof, and for the use and behoof of his legal representatives, for the full term of said patent as fully as stated above.

"And I do hereby declare that I have not conveyed to any other party the rights herein transferred to Archibald G. Leedy.

"In witness whereof, I have hereunto set my hand and affix my seal this twenty-first day of June 1886.

"[SEAL.]                    WILLIAM C. SMALLSTIG

"Attest:

"A. B. CRAWFORD,
"C. B. HOLLAND."

Which deed was acknowledged in the usual form. To the introduction of which patent right deed plaintiff objected. The objection was by the court overruled and plaintiff excepted.

The testimony of Mary A. Leedy then continued as follows:

"Q. State all the facts concerning this contract you entered into? A. There is no other writing that I remember or know anything about. I don't think that I can tell anything more or better than is stated in the answer there. Of course, the gentlemen came to us, Mr. Onstott and Mr. Smallstig. Mr. Smallstig and his wife were there two or three times solicting us to buy this territorial right, Georgia, and afterwards for Colorado, and of course we were a little fearful about it for fear it was a fraud, and we hesitated, and he came two or three times about it, and Mr. Onstott was there, and they all pressed so, said it was just one of the best selling things that had ever come out, and it would just make us a fortune, and a great many things that, of course, I can't remember, but the inducements were

such that I was very anxious for my husband to go into business. We had broken up, and maybe it would bring him out all right and make lots of money for him, and so under the representations that they made that it was such a splendid thing, to be such an easy thing to sell, and make so much money, why of course I signed it.

"*Q.* You got the deed to the state of Colorado? *A.* Yes, sir; but then it never amounted to anything. It worsted us $100 instead of making us anything.

"*Q.* You have the deed to Colorado yet. *A.* Yes, sir.

"By the court: You can go out there and sell the patent now just as well as ever? *A.* I don't think the time ever was when we could sell it. It was represented to us as being a practical thing, and after we found out that it was not we never tried to sell it to a single soul.

"*Q.* Did they have the sad iron there? *A.* Yes, sir; they took it there for us to see.

"*Q.* You looked at it and saw how it run? *A.* Yes, sir; but of course Mr. Smallstig was an expert in fixing it up to make it run, and he fixed it up so it would run nicely and did some little ironing, a small handkerchief, but we never could make it do at all, and it seems to me it would take $2 or $3 worth of alchohol to run it a day, instead of a nickel's worth. After we tried it we thought we didn't understand it and we thought it was still genuine, and I ——

"*Q.* State if you asked for one of these irons to test? *A.* Yes, we wanted one of the reservoirs, and I think he claimed he was out; we wanted it there to test it and keep it there a few days before we traded, and he refused on those grounds; said he didn't have a spare one. The impression was made on my mind that it would make us thousands and thousands of dollars.

"*Q.* You say you had experience in ironing cloth- ing and instead of the sad iron taking a nickel's worth of alcohol a day you say it would take $2 or $3 worth? *A.* We tested the thing thoroughly afterwards. Of course we didn't have it before the trade was made, only just a day. or two, only just to iron a handkerchief or two, and that made us think it was genuine and the most practical thing in the world, and we bought it on their representations. But after we bought it it didn't give satisfaction.

"*Q.* What was the result of that test? *A.* The result of that test was, it seemed to me, it would have taken $2 or $3 or $4 worth of alcohol to iron a day, and we never could get it hot enough to iron only some small things—handkerchiefs and things like that. It was the greatest fraud ever invented; we tried to make it work and tried, and my husband said he wouldn't try to sell it to a living soul, he had too much honor about him. He tried it first, though, before he knew it was a fraud.

"*Q.* Knowing what you do after the test, would you have bought that sad iron if it was not for the representations and statements of Mr. Smallstig and Onstott? (Objected to. Objection overruled. Defend- ant excepted to the ruling at the time.) *A.* I would not.

"*Q.* And on these representations you have pur- chased your territory for your husband? *A.* Yes, sir.

"*Q.* State if you remember a transaction which occurred between yourself and Mr. James R. Milner in regard to your signing these papers? (Showing the witness the A. C. Comings deed of trust.) *A.* Yes, sir.

"*Q.* State under what consideration you signed those papers? *A.* I thought I was signing just some- thing to increase the interest on the deed of trust to Onstott and Smallstig, and never knew any better

until months afterwards. I never heard Mr. Comings' name; I didn't know there was such a man living for months afterwards. I thought we were just signing a little additional writing, agreeing to increase the interest on the original papers.

"*Q.* State the conversation to you by Mr. Milner? *A.* He came to us and told us if we would agree to increase the interest he would let it run quite a while, and under those circumstances we signed those papers.

"*Q.* Mr. Leedy signed them too, did he? *A.* Yes, sir, thinking as I did that it was just to increase the interest.

"*Q.* Was Mr. Leedy present when you signed it? *A.* Yes, sir.

"*Q.* What was the consideration for your signing this second deed of trust, which you took to be a contract to increase the interest? *A.* Nothing in the world. The papers were never read to us there. We just thought it was the same original papers with just a little additional writing, agreeing to increase the interest.

"*Q.* When he first proposed this to you did he have the papers there? *A.* No, sir.

"*Q.* Just state his conduct. *A.* He went back to the office and said it would take him some little time to get the papers. I don't know just what his words were, but the idea was to me that he was going to write this agreement for us to sign.

"*Q.* To extend the same and to increase the interest? *A.* Yes, sir; and in the mean time we drove back by his office; he was in the office and he came out and I signed it just as I tell you. The signing was right there by his place of business on Boonville street; I was out in the buggy and he brought them out to me. I never knew anything about any notary public until

after we had signed them when he called one out to witness the thing.

"*Q.* What did this notary public do after he came up? *A.* It seemed to me that he asked us if we did that of our own free will and accord, or something; I don't remember what exactly, and I was so taken by surprise I don't know what I did.

"*Q.* Up until after you had signed the papers you didn't see any notary public? *A.* No, sir. I didn't see any; he must have been back of us for I didn't see him.

"*Q.* He didn't appear until after he had got your signatures to the papers and then he popped up? *A.* Yes, sir. I never seen him before and never thought about such a thing before.

"*Q.* Tell the court when you first learned you had signed a deed of trust instead of a contract to increase the interest? *A.* I don't remember. I think, as well as I can remember, it was just before we were cited to the justice's court, notified to attend.

"*Q.* It was about that time that suit was commenced against you for possession in the justice's court that you found it out? *A.* Yes, sir.

"*Q.* How did you find it out? *A.* Mr. Milner wrote me a little note to come over and pay rents as per agreement in the deed of trust or whatever it was. I came right over, my husband wasn't there, and wanted to know how it was he demanded rents of us; that we had never agreed to pay any rent, and he then told me he had sold the property. We never heard of it and knew nothing about it. I told him I didn't have any money for him, and it was just after that that we were sued. That is the first I knew of it.

"*Q.* To refresh your memory, do you remember your attorney calling your attention to the fact of your

signing those papers? *A.* Yes, sir, Mr. Campbell did; yes, sir; he found it out first.   You are correct.

"*Q.* Then is when you found it out; your attention was called to it by your attorneys? *A.* Yes, sir.   I think then next we got a little note from Mr. Milner, and then in a short time we were sued.

"*Q.* Isn't it a fact that a note was dropped first to you and then you were sued, and you were consulting Mr. Campbell when you found out for the first time the nature of the contract? *A.* I don't want to tell anything only just what is positive facts, and my recollection is very poor.   I know one thing that it was some time after we signed those papers before we knew we had ever signed anything else only just the original papers.   But I do not remember just when I first learned it was just a deed of trust instead of a contract to raise the interest and extend the time.

"*Q.* Who explained that to you? *A.* Mr. Campbell, I think; that is the best of my recollection.

"*Q.* That was the first time you knew there was a deed of trust? *A.* Yes, sir.

"*Q.* It was your intention to increase the interest and get a longer time? *A.* Yes, sir.

"*Q.* Did you receive any money at all at the time Mr. Milner got you to sign this? *A.* No, sir; I never heard of any money at that time.

"*Q.* Nothing passed when you signed this new note? *A.* No, sir."

Cross-examination by plaintiff's counsel:

"*Q.* Did you conduct this entire business with Mr. Smallstig and Mr. Onstott in the purchase of the patent right? *A.* No, sir.

"*Q.* Did your husband do some of it? *A.* Well, of course it was a joint affair.

Vol. 114—30

"*Q.* Who did the most of the talking to them? *A.* I am sure I can't tell; I don't know who did the most.

"*Q.* It was his transfer; it was to him? *A.* Yes; I signed for his benefit.

"*Q.* It was to secure his debt that you signed them? *A.* Yes, sir.

"*Q.* You say you didn't know about this second deed of trust when you signed it. *A.* No, sir.

"*Q.* You knew the first one was a deed of trust on the land? *A.* Yes, sir.

"*Q.* You knew it was a deed of trust on this land to secure your husband's debt? *A.* Yes, sir.

"*Q.* You thought when you signed the second one that you and he were simply signing the same deed? *A.* Yes, sir, just thought we were signing a little additional writing agreeing to give a little bigger rate of interest.

"*Q.* And this second one you were signing you thought was to secure this same debt of his? *A.* Yes, sir.

"*Q.* Then the instrument you and he together signed was made to secure what you considered his debt? *A.* Well, it was the same old thing, the original papers.

"*Q.* Mr. Milner went to see you a number of times about this note before you executed a second one? *A.* Well, he was there a time or two. I don't remember just how many.

"*Q.* He went there to see about collecting it? *A.* Yes, sir.

"*Q.* And you were pressed for money and wanted more time? *A.* Yes, we told him we hadn't been able to do anything.

"*Q.* And wanted more time? *A.* Yes, sir.

"*Q.* And you agreed if he would increase the interest he would extend the time? *A.* Yes, sir.

"*Q.* You understood all of this agreement was making a mortgage on that land? *A.* The same old mortgage that had been made; nothing new.

"*Q.* The time was extended and the rate of interest increased? *A.* Yes, sir.

"*Q.* Of course you didn't infer from him that the mortgage was to be taken off or anything of that kind? *A.* No, sir.

"*Q.* There was still to be a mortgage on the land? *A.* Yes, the same old mortgage is what we thought.

"*Q.* You say when the notary came out to take your acknowledgment he asked you if you executed that as your free act and deed? *A.* As well as I remember he did, as was customary; but we didn't know he was there.

"*Q.* Didn't he ask you if you were acquainted with the contents of the instrument? *A.* I have no recollection of his saying that.

"*Q.* And then did you execute this as your free act and deed? *A.* I don't remember his saying that. I didn't know anything about there being a notary there until he came up and said something, but I don't remember the words he said.

"*Q.* He might have said that? *A.* I don't know what he said.

"*Q.* He just asked you a question or two in some formal way. *A.* As well as I remember that is what he said.

"*Q.* You said before that he asked you if it was your voluntary act, or something of that kind? *A.* Yes, I have been thinking the matter over and I don't think he said that. I think, as well as I remember, he just asked if we acknowledged that it was our signatures.

"*Q.* Well, it was your impression before dinner that he asked you that? *A.* Well, I studied the matter over and it is a good while, and my recollection is not the best in the world.

"*Q.* Well, that was your recollection before dinner? *A.* Well, if I said so it was."

Re-direct by defendant's counsel:

"*Q.* I believe you stated this morning that you purchased this patent for your husband? *A.* Yes, sir.

"*Q.* And that is why you executed your note? *A.* Yes, sir, that was it; it was for him.

"*Q.* Do you remember Smallstig presenting this note to you at the time it fell due? *A.* No, sir.

"*Q.* As a matter of fact, don't you remember that it fell due and he gave you an extension of some time on it? *A.* Yes, sir."

Plaintiff objects to last question and answer and asks that it be excluded. Objection overruled. Plaintiff excepts.

*Sixth.* Defendants then introduced A. G. Leedy, who testified in substance to the same thing testified to by his wife. Defendants then rested.

Plaintiff then introduced evidence as follows:

James R. Milner being recalled testified that he bought the note in question for plaintiff before it was due; that he made an extension of time on it when it was due; that he had gone to Mrs. Leedy several different times to collect it, and that the Leedys were unable to pay, and that he granted them time once or twice, and made a memorandum in pencil and extended time three months.

Witness then continued as follows:

"After I had seen Mrs. Leedy different times and they had begged off different times, I then agreed with her, if they would give new papers to increase the interest, I would extend the time, the new note to

include the original amount and increase the interest and that is all I did do. I just had them give a new note for the whole amount.

"*Q*. What did you say to them? *A*. If they asked me any questions, I don't remember anything about it. I explained to them that the note was for the amount with interest up to that date and increased interest at ten per cent.; and in order to do that I gave them this six months, but they insisted on longer time and I gave them six months. It was for their favor I was doing this thing and not my own at all, because I wanted the money.

"*Q*. Did they ever say anything to you about being fooled in the sad iron. *A*. Nothing in the world. Mrs. Leedy thanked me for the favor."

Cross-examined by defendant's counsel: Witness repeated what he had said in the examination in chief, then cross-examination proceeded as follows:

" *Q*. And you have no means by which you can refresh your memory so as to be able to testify when you bought that note? *A*. Not now I haven't, no, sir. It has been some time ago. I am doing that kind of business continually.

" *Q*. Do you ever make any memoranda of your transactions of buying and selling? *A*. Sometimes I do and sometimes not.

" *Q*. Have you a check book or anything like that to refresh your memory as to when you bought this? *A*. I don't know whether I have or not. I have check books. Sometimes I issue checks and sometimes I pay money.

" *Q*. Now you say your only object in taking this second note was to extend the time and raise the interest? *A*. I didn't say that was my only object.

" *Q*. Isn't it a fact that your object was to get Mary A. Leedy and her husband on a second note

because he wasn't on the first? *A.* I don't remember that I thought anything about it. I don't remember that I ever recognized the fact that Mr. Leedy wasn't on the first note.

" *Q.* You are an attorney-at-law? *A.* Not much of a one.

" *Q.* That is the note (showing witness Mary A. Leedy's note) you took this in renewal of? *A.* Yes, sir.

" *Q.* You tell this court the only object you had in view was to increase the interest and extend the time? *A.* I took that note for Mrs. Leedy's accommodation and gave her additional time on the note. What my intention was at the time, I don't know as it makes any difference in this case. I bought it for the other parties.

" *Q.* You have stated in your examination in chief you gave them an extension of three months. *A.* Yes, I gave them more than that.

" *Q.* But you had given them that how long before they executed those new papers? *A.* I don't know; it was some time after the extension.

" *Q.* I want to know if you have any knowledge how long it was after you extended this three months before you got them to execute those new papers? *A.* No, sir, I don't remember.

" *Q.* Before you got this new note didn't you institute a suit? *A.* No, sir.

" *Q.* Didn't you bring a suit in Charles Evans', justice of the peace, court before you got those new papers? *A.* No, sir.

" *Q.* Didn't you bring it under a clause in this (showing him the first deed of trust) deed of trust? *A.* No, sir.

" *Q.* Did you bring this suit as an attorney-at-law? *A.* I guess I did; yes, sir.

"*Q.* What did you base that suit upon; didn't you base that upon a clause in that first mortgage? *A.* No, sir, not that I know of; no, sir. I based it upon a clause in the second, I think, I don't know. I based it upon the fact of their being in possession of the property and I wanted to get possession of it.

"*Q.* I will ask you if you didn't bring this suit on that clause. *A.* I brought it for the possession of the property because I considered they were owing me.

"*Q.* You stated, I believe, that you took this new note and new deed of trust in place of the first note and deed of trust. Why didn't you surrender that note and deed of trust at the time? *A.* It was mislaid, I believe, at the time, and I don't know as I was asked to.

"*Q.* Is that the reason you didn't surrender it that time? *A.* I don't know why I didn't. I don't suppose I was asked for it; I would have done it. I offered to surrender it and told them I would cancel it on record, if they would pay for the release.

"*Q.* Did you tell Mrs. Leedy that you had mislaid the other? *A.* I don't recollect that there was anything said about it, now.

"*Q.* Do you know now when you did offer to surrender it? *A.* I told Mr. Campbell I would; I don't know whether I did before or not.

"*Q.* Wasn't it after this suit was brought. *A.* No, sir. It may have been after the justice's suit was brought, because I don't think there was anything said about it until then.

"*Q.* I believe you never offered to surrender this deed of trust and note up to that time. *A.* I have always been ready to surrender it. I don't know as it was necessary for me to make that offer." Plaintiff

Defendants then introduced evidence as follows:
R. G. Campbell testified as follows: "Q. State Mr. Milner's reason for not surrendering the first note and deed of trust. A. I went to Mr. Milner when this suit was brought in the justice's court to find out on what he based the suit. I went and searched the record and I found there was a deed of trust from Mrs. Leedy to Smallstig and Onstott, and then I went to Mr. Milner before the case was tried; I was trying to get evidence and I also had a talk with Mr. Smallstig as well as Mr. Milner; and I asked Mr. Milner, in the course of a conversation, as an attorney for the Leedy's, why he hadn't surrendered the first deed and first note. I remarked to him that they knew nothing of the second note and second deed of trust until I discovered it and told them of it, and his remark to me was, as near as I can remember, standing right down by the office, that he held on to the first note and deed of trust for additional security, and I says, 'Well, can't you surrender that note and deed of trust to me now as their attorney; you have the second note and deed of trust, you are not entitled to the first;' and he says, 'No, it is mislaid and I can't find it.' I says, 'Can't you make search for it?' He says, 'No, I have searched for it and I can't find it, it has been mislaid.' That is about the substance, and, I think, about the words of the conversation we held. I then went off and had a talk with Mr. Smallstig, and from him learned of the notes being transferred without recourse.

"Q. Can you tell anything about when that transfer was made? A. I can only tell from hearsay. It was on the information I got from those two conversations.

"Q. What did he say about the second mortgage holding, or anything of that kind? A. I don't know that he spoke of the second mortgage holding, anything

further than his explanation was that he held on to the first, that he held it as an additional security to him, and when I asked him if he couldn't surrender it then he claimed that it was mislaid.

"*Q.* State to the court if Mr. Milner didn't tell you in that conversation that he held that note and deed of trust to see whether the second note and deed of trust would stick, or words to that effect. (Objected to. Objection overruled.) *A.* I don't remember of his saying anything of the kind. The conversation occurred just as I have related it, and it occurred on the corner by Mr. Milner's office."

Cross-examination by plaintiff's counsel:

"*Q.* Did Mr. Milner afterwards offer to deliver you this note and deed of trust. *A.* Mr. Milner never offered to deliver me that note and deed of trust until you, as attorney, offered it here in this court.

"*Q.* Didn't he say the second one was the one he wanted to hold onto as security? *A.* No, sir, he said he wanted to hold on to both of them. It was that circumstance that made an impression on my mind, and you offered it to me and I said no and handed it back to you, because you saw the point I set forth in the pleadings."

The court then gave judgment and decree for the defendants.

In the decree the court finds all the facts set up in the amended answer, to-wit:

*First.* That the note and deed of trust made to Onstott and Smallstig for $1,000 was void, being bottomed upon the promissory note of a married woman.

*Second.* That the deed of trust made on the fourteenth day of May, 1887, to James R. Milner, trustee for A. C. Comings, was but an extension of the first note and was obtained by fraud and is void, and that the sale thereunder was void, and the trustee's

deed made in pursuance thereof is void and conveyed no title to the plaintiff.

The court then adjudges and decrees that all of the said deeds be annulled and canceled as a cloud upon the plaintiff's title, and all title of the plaintiff be divested and vested in the defendant, Mary A. Leedy.

In due time at the same term of the court the plaintiff filed his motion for new trial for the following reasons:

*First.* The finding and judgment of the court are against the law.

*Second.* The finding and judgment of the court are against the evidence.

*Third.* The finding and judgment of the court are against the law and equity under the evidence.

*Fourth.* The court erred in admitting improper and illegal evidence offered by the defendant against the objection of the plaintiff.

*Fifth.* The court erred in excluding proper and legal evidence offered by the plaintiff.

*Sixth.* The judgment of the court was for the defendants when it should have been for the plaintiff.

Which motion was by the court, on the second day of January, 1891, overruled and the plaintiffs excepted, and appealed to this court.

I. The court did not err in overruling the motion to strike out the separate answer of the defendant Mary. While it is true that under the law as declared by this court, she being a married woman at the time of the execution of the note to Smallstig and Onstott rendered it void and of no effect, yet she, notwithstanding her coverture, could by and with the knowledge and consent of her husband, he joining with her, execute a mortgage on her property. In the case of *Hagerman v. Sutton*, 91 Mo. 519, this court held, that when a married woman in conjunction with her husband signs

a note and executes a mortgage on her land to secure the same, the land not being a part of her separate estate, is not valid and binding on her as to her note, it does not follow that the mortgage is invalid, and that she is not competent to mortgage her land of which she is not seized as her separate estate. *Wilcox v. Todd*, 64 Mo. 388.

While the first note was only signed by Mrs. Leedy, the one under which the lot was sold, given in lieu of the first one, was signed by both her and her husband as well also as was the deed of trust given to secure its payment. This of course would relieve the last note of the objection of the want of ability on the part of Mrs. Leedy to execute it that existed as to the first, and it and the deed of trust were valid and binding on her, and the sale of the lot passed the title, unless the note in the first place was obtained by fraud and fraudulent misrepresentations on the part of the payees, Smallstig and Onstott, and there was no new consideration for the last note, or that it was obtained by fraud and deceit. The fact that the note was void and that it was also obtained by fraud and was without consideration, constituted good defenses to plaintiff's cause of action and the motion to strike out was properly overruled.

II. Mrs. Leedy alleges in her answer that both notes were obtained by fraud and fraudulent representations, were without consideration, and that she never at any time knowingly signed the last note or the mortgage to secure its payment under which the lot was sold. She stated as a witness that Milner wrote her a note in which he stated that he wanted her to sign some paper agreeing to pay an increased rate of interest on the first note and that if she would do so, that he would give them more time. That she drove up in front of his office and while sitting there in her buggy he came out and

said that it would take him some little time to prepare the papers; that she waited for a short time when he returned with papers which she signed without reading, believing that she was simply signing papers to pay an increased rate of interest, and did not know anything to the contrary for several weeks, when to her great surprise he notified her to call and pay rent on property which she knew was her own.

Milner did not deliver up to defendants the original note and deed of trust at this time. Nor did he do so for several weeks afterwards and not even then until he had sued defendants for possession of the property for non-payment of rent, and was applied to by their attorney for them, when he gave as an excuse for not doing so that he mislaid and could not find them, yet by some means he knew the exact amount due on the note, principal and interest, for which he wanted it renewed.

It looks very much like he did not want to surrender the old note and deed of trust at that time for fear that defendants would discover that they had executed a new note and deed of trust, and this he did not desire they should do. He does not deny these statements in his evidence and they must therefore be taken as true. He was the agent of plaintiff and conducted the entire business for him, even to the purchase of the note.

What seems remarkably strange, the notary by whom it is claimed that the acknowledgment to this last mortgage was taken was not placed upon the witness stand to contradict the statements of defendants to the effect that it was not acknowledged by Mrs. Leedy or to account for his acts in connection therewith, nor is his absence in any manner accounted for.

It is well settled law that the certificate of acknowledgment of a married woman is only *prima facie* evi-

dence of the facts therein contained and that the officer taking the acknowledgment is a competent witness either to support or impeach it. *Mays v. Pryce*, 95 Mo. 603; *Belo v. Mayes*, 79 Mo. 67. And while the certificate. may be overcome the evidence required to impeach it must be something more than her testimony, as is said in the case of *Biggers v. Building Co.*, 9 Mo. App. 210; *Morrison v. McKee*, 11 Mo. App. 594; *Ray v. Crouch*, 10 Mo. App. 321 and *Riecke v. Westenhoff*, 10 Mo. App. 358. It must also be clear and convincing.

Mrs. Leedy was corroborated in this statement by her husband, who testified as a witness without objection, as admitted by appellant in his brief. The evidence does seem to establish the fact beyond question that Mrs. Leedy did not knowingly execute the note or the deed of trust to Milner, and for that reason, if there was no other, the sale thereunder by him was void and passed no title. She, being a married woman, could not convey or mortgage her property in any mode or manner other than that pointed out by statute authorizing her to do so.

III. The original note was given for the sole right to make, use and vend in the state of Colorado a patent right improvement in what is called a *"sad iron,"* of which Smallstig, one of the payees, claimed to be the patentee. The consideration expressed in the bill of sale is $5,500. The sale was made after several visits by Smallstig and wife, and Smallstig and Onstott, and various and divers statements and misrepresentations as to the usefulness and salableness of the iron; that one pint of alcohol only would be required to run it per day, when in fact Mrs. Leedy testified that it would take $2, $3 or $4 worth per day; that she never could get it hot enough to do good work, and that it was the greatest fraud ever invented; that before they pur-

chased the right she asked Smallstig to leave one of the irons with her for a few days so that she could try it before trading, but that he declined to do so, giving as a reason that he did not have a spare one.

The original note being void because of the inability of the payor, Mrs. Leedy, to make a contract of this kind on account of her coverture, it was void in the hands of plaintiff as indorsee even without notice of the fact that it was obtained by fraud, and was without consideration; and, although the last note was given in renewal of the first, there was no consideration therefor, and it was subject to the same defenses as was the original note. And not only this, but the evidence shows conclusively that it too was obtained by fraud and deceit on the part of Milner, who was plaintiff's agent.

The only consideration for either of the notes was the right to the state of Colorado in the patented iron, which the evidence shows is worthless and unsuited to the purpose for which it was made. The adaptation of a machine to the uses for which it is made is always warranted. *Smith v. Hightower*, 76 Ga. 630; Daniel on Negotiable Instruments, sec. 203, p. 226. So generally, if the thing purchased was entirely worthless when purchased, there is a total failure of consideration. *Arnold v. Wilt*, 86 Ind. 367; *Brown v. Weldon*, 27 Mo. App. 251. There is a total absence of consideration for either of the notes.

Smallstig and Onstott were not sworn as witnesses to contradict the statements of Mrs. Leedy, and they knew above all others whether or not her statements in regard to the consideration of the first note, and the means by which it was obtained, were true or false.

That the transaction in the first place was conceived in iniquity and besmirched all the way through with the badge of fraud is apparent to any one who will take the pains to read the evidence in the case, and

the judgment is eminently just, correct and for the right party. Judgment is affirmed. All of this division concur.